Christopher Gregg Thomas
PO Box 11718
Bozeman, MT 59719
303.503.8362
gthomasblrf@gmail.com

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF MONTANA

| In re, | Chapter 11 |
|---|---|
| CHRISTOPHER GREGG THOMAS, | Case No. 2:26-bk-20103-BPH |
| Debtor. | |
| | DEBTOR'S RESPONSE REGARDING TURNOVER, |
| CHRISTOPHER GREGG THOMAS, | STATEMENT OF MATERIAL DEVELOPMENTS, AND REQUEST FOR DETERMINATION OF LIMITED ISSUES OR LEAVE TO PURSUE REMAINING CLAIMS IN STATE COURT |
| Debtor-In-Possession, | |

Christopher Gregg Thomas, the Debtor and debtor in possession, submits this Response in advance of the briefing concerning property held by BSP of Helena, Inc., doing business as 4 Corners Pawn ("the pawn shop").

This filing serves three limited purposes;  First, it provides the Court, the pawn shop's new counsel, and creditors with the factual and procedural history necessary to understand that the present dispute did not originate as a routine bankruptcy turnover matter. It arose from a longstanding course of pawn transactions, the pawn shop's refusal to accept individual redemption and payoff of property, the pawn shop's continued possession of property that had already been paid, the resulting state-court action, and the parties' subsequent settlement agreement.

In a recent conversation with the pawn shop's new counsel, he noted he had not read and did not have any of the state court proceedings and would appreciate copies.  Those are attached hereto.

1

Second, this response explains that the present turnover motion cannot properly become a summary adjudication of the validity, priority, or extent of the pawn shop's interest or lien rights, the rights of senior titled lienholders, or the parties' broader state-law claims.

Third, it informs the Court that the passage of time has eliminated the equipment-based reorganization path that originally made prompt turnover economically important. The Debtor anticipates seeking dismissal of the Chapter 11 case rather than continuing to incur administrative expense while litigating a broad state-law dispute that may ultimately require a jury.

This Response does not ask the Court to decide every dispute between the parties. It asks the Court to recognize that this matter has evolved into a complex state-law controversy that cannot fairly be reduced to a simple turnover proceeding.

I. PRELIMINARY STATEMENT

The Debtor initially pursued turnover because rental and construction vehicles held by the pawn shop appeared essential to continued operations and to the generation of revenue not available for a year-- since the pawn shop initially refused to turn over property after payment was tendered in June 2025 -- and necessary for a Chapter 11 plan.

The pawn shop's own records[1] characterize the underlying dealings as pawn transactions, identify loan numbers, state principal balances and finance charges, and disclose annual percentage

---

[1] Exhibits B,E,F,G

2

rates that include "cost of credit" disclosures that substantially exceed ordinary commercial rates and would normally require licensing to charge.

The dispute has since developed far beyond the question whether the pawn shop physically possesses property of the estate and which the pawn shop did not appear to object until well after the motion was granted.

The pawn shop now advances or may advance alternative characterizations under which the transactions were either[2]:

A. pawn transactions or secured extensions of credit; or

B. completed sales coupled with rights to repurchase.

The Court need not finally choose between those characterizations in this contested matter. Under either characterization, substantial Montana-law issues remain.

If the transactions were pawns or secured credit, the issues include the pawn shop's authority to receive motor-vehicle titles, the legality of the disclosed finance charges and rates, applicable licensing requirements, redemption rights, the treatment of payments, and the pawn shop's refusal to release paid or redeemable property.

If the transactions were completed sales, the issues include voluntary title transfer by filing executed titles under Montana motor vehicle statutes and administrative rules, the forty-day title-application requirement, the limited statutory procedures afforded to licensed motor-vehicle dealers, the pawn

---

[2] Exhibits B,D,E

shop's lack of dealer licensing, the use of titles assigned in blank, the rights of previously perfected

titled lienholders, and the pawn shop's failure to place the vehicles into its own name.

Both paths also return to the legal effect of the parties' settlement agreement.

II. THE MATTER SHOULD BE DIVIDED INTO TWO DISTINCT QUESTIONS

The Court should separate:

1. The limited bankruptcy question concerning turnover and whether the pawn shop is entitled to

affirmative relief in this contested matter; and

2. The broader state-law dispute concerning settlement breach, ownership, lien priority, title

practices, licensing, statutory damages, contract claims, and defenses.

The Debtor understands that turnover of property may be requested by motion. The present dispute,

however, extends beyond possession and includes contested issues concerning ownership, lien priority,

settlement interpretation, title practices, and other property interests. The Debtor respectfully submits

that these broader issues are not appropriately resolved through the pending turnover motion alone. See

Fed. R. Bankr. P. 7001.

Accordingly, the turnover motion may be a proper procedural vehicle to recover estate property whose

status is established. It should not become a substitute for an adversary proceeding or jury trial

concerning disputed ownership, lien priority, contract damages, statutory violations, and competing

state-law claims.

4

## III. THE PAWN SHOP'S OWN PLEADINGS AND RECORDS CHARACTERIZE THE DEALINGS AS PAWNS AND LOANS

Before the bankruptcy case, the pawn shop filed an Answer and Jury Demand in the Montana Eighteenth Judicial District Court. This is answer is attached here as Exhibit B.

Among other things, the pawn shop admitted:

1. that it engaged in multiple pawn arrangements with the Debtor dating to approximately 2023;

2. that, when the Debtor pawned titled property, the pawn shop required delivery of both the property and its title;

3. that the parties agreed to a modified arrangement involving cumulative monthly fees;

4. that the pawn shop coded the arrangement in its software as its standard charge plus an additional late charge;

5. that the Debtor paid at least part of the amounts the pawn shop claimed were owed; and

6. that the pawn shop demanded a jury trial on all triable issues.

The pawn shop's sworn declaration[3] likewise states that the Debtor "pawned" the items, owed payment on "pawned items," requested additional time before the pawn shop sold the "pawned items," proposed additional monthly "interest," and that the pawn shop agreed to the proposed terms because of the parties' longstanding relationship.

The pawn shop's internal and customer-facing documents use the terms[4]:

- pawn;
- loan;
- current loans;
- principal;
- finance charge;
- annual percentage rate;
- cost of credit;
- security interest;
- pledged property;

---

[3] Exhibit D
[4] (Exs. E, F, G, H).

|                      |                    |              |
|----------------------|--------------------|--------------|
| • repayment;         | • redemption;      | • fees; and  |
| • renewal;           | • charges;         | • fees owed. |

Those words are not supplied by the Debtor. They are the words the pawn shop selected to describe, administer, and collect the transactions.

## IV. THE PAWN TICKETS CONTAIN CONFLICTING CHARACTERIZATIONS

The pawn tickets contain language that the pawn shop may rely upon to characterize the transactions as sales with an option to repurchase[5].

At the same time, the same instruments prominently disclose:

|                              |                    |
|------------------------------|--------------------|
| • an "amount financed";      | • pledged goods;   |
| • a "finance charge";        | • repayment;       |
| • an "annual percentage rate"; | • loan periods;  |
| • the "cost of your credit"; | • renewals; and    |
| • a security interest;       | • redemption.      |

The sale characterization therefore cannot be isolated from the balance of the instrument. In Bluebird Property Rentals, LLC v. World Business Lenders, LLC[6], the Montana Supreme Court affirmed a finding of ambiguity where loan documents contained conflicting provisions and the drafter prominently emphasized one message while placing the inconsistent provision elsewhere in less conspicuous language.

The Court explained that the loan documents must be read as a whole, that conflicting

---

[5] Exhibit E
[6] Bluebird Property Rentals, LLC v. World Business Lenders, LLC, 2026 MT 33.

reasonable provisions may create ambiguity, and that ambiguity is construed against the

drafter and in favor of the non-drafting party's reasonable interpretation.

Here, the credit disclosures appear prominently in boxed or emphasized portions of

the tickets. The purported sale language is comparatively less conspicuous and appears

to be easily blocked by signatures.

Bluebird does not itself decide whether these transactions were pawns or sales.

It establishes the relevant interpretive point: the pawn shop may not isolate one line of its form and

ignore the conflicting language it prominently used throughout the same instrument. See Exhibit E.

V. UNDER EITHER CHARACTERIZATION, MATERIAL STATE-LAW ISSUES REMAIN

The dispute may be illustrated as follows:



A. "Pawn/Credit" characterization: Montana's pawnbroker statutes prohibit charging interest above the statutory rate of 10% without first obtaining the license required by law[7]. They also restrict receipt of a motor-vehicle title for the purpose of a pawn transaction or as a pledge for a loan.[8] The pawn shop's Answer admits[9] that, where titled property was pawned, the pawn shop required delivery of both the property and its title. Additionally, the relevant statute does not say its permissible to take a title when both the vehicle and its title are possessed by the pawn broker, it simply states when not properly licensed, no title can be received as part of a pawn transaction. The pawn shop's declaration likewise states that the pawn shop took possession of both the titled property and its title and believed it could thereafter sell the property in the same manner as an untitled item.[10] That is not a denial of title receipt. It is an admission accompanied by the pawn shop's legal theory concerning why it believed the practice permissible.

B. "Completed-Sale" characterization: If the pawn shop contends that it purchased each vehicle outright, Montana's voluntary-transfer statutes become directly relevant. An ordinary transferee is generally required to apply for a certificate of title within forty days. Licensed motor-vehicle dealers are afforded separate reassignment procedures and may transfer certain vehicles without first obtaining a new certificate of title in the dealer's own name.

---

[7] § 31-1-401(1), MCA: "A person may not carry on the business of pawnbroker or junk dealer by receiving goods pawned or in pledge for loans at any rate of interest above 10% a year without first obtaining a license."

[8] § 31-1-401(4)(c), MCA "Unless licensed as a consumer loan licensee or a deferred deposit loan licensee, a pawnbroker or junk dealer may not … receive the title to a motor vehicle for the purpose of a pawn transaction or in pledge for a loan."

[9] Exhibit B
[10] Exhibit D

The pawn shop has not identified a Montana motor-vehicle dealer license. Nevertheless, the pawn shop obtained paper titles, required blank assignments (open titles), retained the titles for periods substantially longer than forty days, did not place the vehicles into its own name, and has now filed those open titles into the federal record in support of its claimed rights.

If the pawn shop purchased the vehicles, it must explain its failure to complete the transfer process applicable to an ordinary transferee. If the pawn shop relies upon dealer procedures, it must establish that it held the dealer license required to use those procedures. In discovery and license production into the state court document, the pawn shop did not produce the required license when asked to do so.

VI. STATE v. SCHAEFER CONFIRMS THE IMPORTANCE OF MONTANA'S PAWNBROKER REGULATION

State v. Schaefer[11] involved a pawnbroker operating within the Blackfeet Reservation who charged annual rates alleged to be 1,228% and 869%. The Montana Supreme Court held that Montana had a substantial and important interest in enforcing its pawnbroker statutes. The Court emphasized that licensing and recordkeeping protect the public, allow authorities to trace property, and prevent excessive interest charges.

The significance of Schaefer here is not that it resolves every civil claim between these parties. It confirms that Montana's pawnbroker statutes are not technical formalities

---

[11] *State v. Schaefer*, 239 Mont. 437, 781 P.2d 264 (1989).

that may be disregarded because a particular customer proposed, accepted, or benefited from the transaction.

The pawn shop's position that the Debtor suggested or accepted a high monthly charge does not necessarily excuse statutory noncompliance. A regulated party cannot ordinarily avoid a protective statute merely by alleging that the customer proposed the prohibited structure.

VII. THE CONTEMPORANEOUS REFUSAL DOCUMENT CORROBORATES THE DEBTOR'S ACCOUNT

At the final material pre-suit effort to recover property, the Debtor appeared with approximately $40,000 available to pay and redeem selected items. the pawn shop's store manager provided a report titled "Current Loans."

The report identified transactions by loan number and separately listed principal and charges. The handwritten annotations further used the terms principal, fees, compensation, miscellaneous charges, and fees owed.

The manager's calculation reflected approximately $162,600 in total fees and stated that one-half, approximately $81,300, was required before the pawn shop would release property.

The report does not merely state individual repurchase prices. It aggregates principal and charges across multiple loans and demands payment of fees associated with the broader account before release of individual property.

10

The Debtor's online payment history[12] also appears to establish that certain pawn transactions had already been paid. Those paid transactions no longer appeared on the "Current Loans"[13] report, but the corresponding property remained in the pawn shop's possession until the later settlement.

If confirmed by matching the relevant ticket and order numbers, the documentary sequence is:

1. The pawn shop accepted payment;

2. The paid pawn ceased appearing as a current loan;

3. The pawn shop continued to hold the property;

4. The pawn shop conditioned release on payment of fees associated with other transactions; and,

5. the pawn shop returned the property only after the parties entered settlement.

VIII. THE SETTLEMENT AGREEMENT IS THE THRESHOLD ISSUE

The parties later entered into a settlement resolving the state-court litigation and establishing continuing redemption or reclamation rights through approximately November 2026.  The Debtor contends the pawn shop breached that settlement by pursuing turnover or ownership relief inconsistent with the settlement's agreed treatment of the property and by seeking to revive allegations and claims released or restricted by the agreement.

The pawn shop may contend that its bankruptcy filing merely enforced retained rights and did not breach the settlement.  That is a discrete threshold controversy:

Did the pawn shop breach the settlement, or did its filing remain within the rights the pawn shop

---

[12] Exhibit G
[13] Exhibit F

expressly retained?

If the pawn shop breached, the settlement may no longer bar or limit the Debtor's original and later-accruing claims, subject to the settlement's remedies and Montana law. The Debtor contends that, if the settlement was materially breached, statutory and contractual remedies under Montana law may again become available.

If the pawn shop did not breach, the parties must determine the extent to which the broad settlement and release provisions continue to govern both sides' claims. The Debtor respectfully submits that the Court may determine this limited settlement issue if it concludes the issue is necessary to resolve the pending contested matter. Alternatively, the Court may expressly decline to decide the issue and leave it for the Montana state court following dismissal of the bankruptcy case.

IX. THE PAWN SHOP IS NOT ENTITLED TO BROAD AFFIRMATIVE RELIEF IN THIS CONTESTED MATTER

The pawn shop seeks, directly or indirectly, recognition of ownership or interests that may conflict with:

- the official Montana title record;
- senior perfected lienholders;
- the parties' settlement;
- the pawn shop's own pawn documents;
- Montana's title-transfer statutes;
- dealer-licensing statutes;
- pawnbroker statutes; and
- the rights of parties who have not received a full trial on the merits.

The pawn shop's possession of an old paper title assigned in blank does not, standing alone,

establish superior ownership or priority over a lienholder whose interest was previously

perfected through Montana's title system.

Nor can disputed title priority be adjudicated conclusively without the participation

of all parties claiming interests in the property.

The pawnshop, the Debtor, the Debtor's spouse where applicable, senior titled

lienholders, other secured creditors, purchasers, and affected owners collectively comprise

as many as eight interested parties.

That is not a simple two-party turnover dispute.

X. CLARIFICATION REGARDING THE UNITED STATES TRUSTEE'S CHARACTERIZATION
OF THE DEBTOR'S TESTIMONY

The United States Trustee's counsel recently stated or suggested that the Debtor admitted

fraud upon the pawn shop.

The Debtor respectfully disputes that characterization.

The Debtor testified at the § 341 meeting that he "took advantage of a longstanding relationship" with the pawn shop. The Debtor stands by that testimony. By that statement, the Debtor meant that the parties had developed an established business relationship over approximately four to five years, during which the pawn shop repeatedly pawned and redeemed items to the debtor. The Debtor did **not** intend that statement as an admission that he made a knowingly false representation, concealed a material fact, or otherwise committed fraud against the pawn shop.

The Debtor respectfully disputes any characterization that this testimony constituted an admission of fraud. During the parties' approximately five-year relationship, the Debtor paid the pawn shop in excess of $500,000 in principal, interest, and fees. While those payments do not resolve the parties' legal disputes, they are relevant to the Debtor's intent and are not readily consistent with an intent to obtain

property without repayment. Attached here are receipts totaling in excess of Three Hundred Thousand

Dollars[14] paid to the pawnshop since January 2024.

The Debtor did not testify that he expressly told the pawn shop that no other lienholder or

interest existed.

The Debtor did not admit knowingly making a false statement that the property was

free and clear.

The Debtor did not admit concealing a lien in response to a direct question.

The Debtor did not admit intending that the pawn shop rely upon a knowingly false statement.

At the time of the transactions, the Debtor did not understand Montana law to prohibit a pawnbroker

from receiving an open motor-vehicle title. Upon learning of that issue, the Debtor attempted to redeem

the equipment and was refused as explained above.

The Debtor acknowledges that the pawn shop may dispute whether he sufficiently disclosed

other interests and may argue that titles delivered to the pawn shop created an impression of

unencumbered ownership.

That disputed inference is not the same as an admission of fraud. The Debtor further notes that titled-

lien information is maintained through public Montana title records and that UCC filings are publicly

searchable. The availability of those records does not necessarily eliminate any disclosure obligation,

but it is relevant to reliance, causation, and the pawn shop's own diligence.

The Debtor includes this clarification only to ensure that the Court's decision is not

based on an admission that did not occur.

---

[14] Exhibit H

XI. THE PASSAGE OF TIME HAS ELIMINATED THE EQUIPMENT-BASED

REORGANIZATION PATH

The Debtor sought turnover because prompt return of the equipment was expected

to permit construction, excavation, hauling, and rental operations sufficient to support a

Chapter 11 plan. The value of the turnover relief was therefore time sensitive. The delay did not merely

postpone possession. It consumed the practical and seasonal economic value of the requested relief.

The Debtor can no longer represent that return of the equipment at this stage would restore the

feasibility that existed when turnover was originally sought. The Debtor is therefore preparing to

request dismissal of the Chapter 11 case rather than continued administration based on an equipment-

dependent plan that no longer exists.

XII. SCHEDULE OF EXHIBITS:

   A. 7/3/2025 Complaint

   B. Defendants Answer

   C. Plaintiff's Motion for Judgment on the Pleadings

   D. Defendant's Opposition to Judgment on the Pleadings

   E. Sample Pawn Loan Agreement

   F. "Current Loans" Report

   G. June 24, 2025 online loan payment receipts

   H. 2024-2025 Pawn Payment Receipts

XIII. REQUESTED RELIEF

The Debtor respectfully requests that the Court:

A. determine that the pawn shop is not entitled to a final adjudication of ownership, lien validity, lien priority, or damages through the present turnover contested matter;

B. determine, if the Court finds the issue appropriate and necessary, whether the pawn shop's post-petition pursuit of ownership and turnover relief breached the parties' settlement;

C. alternatively, expressly reserve the settlement-breach issue and all related state-law claims for determination in state court;

D. deny any request by the pawn shop for broad affirmative relief concerning title, lien priority, ownership, damages, fraud, or nondischargeability in this contested matter;

E. preserve all claims and defenses of the pawn shop, the Debtor, senior lienholders, co-owners, and other interested parties without adjudication, except as expressly determined by the Court;

F. permit the parties, upon dismissal of the bankruptcy case, to resume or commence appropriate state-court proceedings concerning settlement breach, declaratory relief, title, licensing, damages, and related claims; and

G. grant such other relief as is just.

DATED this 20th day of July, 2026.
Respectfully submitted,
/s/ Christopher Gregg Thomas

Christopher Gregg Thomas

Debtor and Debtor in Possession, Pro Se

16

CERTIFICATE OF SERVICE

I, Christopher Gregg Thomas, certify under penalty of perjury that on the 20th day of Jule, 2026, I served a true and correct copy of the foregoing *DEBTOR'S RESPONSE REGARDING TURNOVER, STATEMENT OF MATERIAL DEVELOPMENTS, AND REQUEST FOR DETERMINATION OF LIMITED ISSUES OR LEAVE TO PURSUE REMAINING CLAIMS IN STATE COURT* by filing/transmitting the same to the Clerk of Court for filing

I further certify that notice will be transmitted through CM/ECF upon filing to registered participants entitled to electronic notice, including counsel for CAT Financial and the United States Trustee to the extent they are registered CM/ECF participants in this case.

DATED this 20th day of July, 2026.

/s/ Christopher Gregg Thomas
Christopher Gregg Thomas